GILBERTSON, Chief Justice.
[¶ 1.] On July 27, 2005, a complaint was filed in the South Dakota Second Judicial Circuit charging Rodolpho Hernandez with possession of methamphetamine with intent to distribute in violation of SDCL 22-42-2, possession of methamphetamine in violation of SDCL 22-42-5, and false impersonation with intent to deceive law enforcement in violation of SDCL 22-40-1. On August 10, 2005, a Minnehaha County grand jury indicted Kevin Javier Ballesillo Selalla a/k/a Rodolpho Hernandez (Selalla) on all three charges. A jury trial was held on January 3-4, 2006. The jury returned guilty verdicts on all three counts. On May 8, 2006, Selalla was sentenced to 10 years imprisonment for the violation of SDCL 22-42-2. No sentence was imposed for the convictions on the other counts. The trial court’s judgment and sentence was filed on May 15, 2006. We affirm.
FACTS AND PROCEDURE
[¶ 2.] On July 26, 2005, at approximately 12:00 p.m., Selalla and a companion checked into Room 215 of the Best Western Empire Towers motel in Sioux Falls, South Dakota. Selalla identified himself in English as Carlos Torres Hernandez from Omaha, Nebraska. On his registration he listed that he was driving a Ford Explorer, license number 295 ALT. The license number actually belonged to another vehicle parked outside the motel.
[¶ 3.] Later that afternoon, Selalla came to the front desk to ask in English if he had received any messages. In the evening, a woman called the front desk from Room 215 to report a suspicious person in the hallway. Not long afterward, a 911 call was placed from the room, but the person making the call hung up. The 911 operator called the front desk to obtain the room number that the call originated from, and then dispatched Sioux Falls Police Officers Chad Gillen (Gillen) and Eric Kim-ball (Kimball) to the motel room to conduct a welfare check.
[¶ 4.] Upon arriving at the motel, Gil-len and Kimball went to Room 215. The officers heard the sound of running water emanating from inside. They proceeded to knock on the door, but were unable to get anyone to answer. They then went to the front desk to get a key to the room. When they came back they knocked once more, announcing that they were law enforcement officers. This time, a woman wrapped in a towel came to the door.
[¶ 5.] Gillen and Kimball told the woman that a 911 call had originated from the room and that they were there to check on her welfare. Once they entered the room, the officers noticed a large glass water *805 bong in plain view on a bedside table. Gillen retrieved a drug-testing kit from his patrol car. He found that the bong tested positive for methamphetamine. The officers took the bong into evidence and arrested the woman, identifying her as Isabel Garcia Vallejo (Vallejo).
[¶ 6.] After her arrest, Vallejo consented to a search of the room. Inside her purse, Gillen and Kimball found $943 in cash and a “pay/owe” sheet. Hidden in the bed sheets, they found a glass straw, a glass test tube with residue, and a Ziploc bag containing 12 grams of methamphetamine. Various other items of drug paraphernalia were also found about the room. In addition, the officers discovered luggage containing male clothing.
[¶7.] Vallejo was taken to the Sioux Falls Law Enforcement Center. Before departing the motel the officers obtained a photocopy of the I.D. that Selalla presented at the front desk upon check-in. The door to Room 215 was re-keyed and the front desk clerk was advised to contact the police if Selalla returned to the motel. Law enforcement issued a “be on the lookout” for Selalla and the Ford Explorer.
[¶ 8.] While in custody, Vallejo was interviewed by John Duprey (Duprey), a narcotics detective with the Minnehaha County Sheriffs Department. Vallejo admitted to being a drug dealer and to having sold drugs in Sioux Falls. She also stated that if she were to give a urine sample it would test positive for drugs. Vallejo told Duprey that Selalla was also a drug dealer involved in distribution in Sioux Falls. She provided Duprey with information as to quantity, frequency, and the number of persons to whom Selalla was dealing drugs. Vallejo indicated that she was cooperating with Omaha police on a significant law enforcement matter. In consideration of that and her cooperation with Sioux Falls law enforcement, Vallejo was given back $100 of the money discovered in her purse. She was told to use the money to rent a motel room for the night and to purchase a bus ticket back to Omaha.
[¶ 9.] Unbeknownst to Gillen and Kim-ball, Selalla had returned to the motel before they departed Room 215 for the Law Enforcement Center with Vallejo. Identifying himself as “Rodolpho,” he again asked in English at the front desk, if he had received any messages. After learning from the front desk clerk that he had none, Selalla proceeded toward the elevator before turning around and telling the clerk that he was leaving to get something to eat.
[¶ 10.] Sometime after leaving the motel for the second time, Selalla called his friend Jackie Jensen (Jensen) to ask if she could pick him up. Selalla told her that he had been in a fight with his girlfriend and that he was upset. Jensen picked him up near the motel and the two drove around while Jensen calmed him down. Eventually, Jensen drove Selalla back to the motel so that he could pick up a change of clothes, as he had decided to stay elsewhere for the night. Upon arriving there, the front desk clerk alerted 911 dispatch to Selalla’s return. Officer James Buteyn (Buteyn) was dispatched to the motel sometime after 12:00 a.m. on July 27, 2005.
[¶ 11.] When Buteyn arrived, he made contact with Jensen who was in her car waiting in the motel parking lot for Selalla. Buteyn took Jensen’s car keys and told her to wait until Selalla could be brought to her for identification. However, by this time, Selalla had managed to depart the motel on foot. Buteyn and officer Ryan Flogstad (Flogstad), who had responded to Buteyn’s earlier call for backup, soon discovered Selalla’s Ford Explorer in the parking lot. The officers ran the plate number on the Explorer, South Dakota *806 8AE 074, and discovered it was registered to Stacey Lane of Mitchell. Buteyn and Flogstad began searching businesses in the surrounding area for Selalla. Flogstad finally located a Hispanic male matching Selalla’s description in the restroom of the Fry’n Pan Restaurant.
[¶ 12.] The individual identified himself as Juan Martinez, but was unable to spell his name. After consenting to a pat down search, Flogstad found him to be carrying $598 and a title to a Ford Explorer signed by Stacey Lane. Flogstad placed the individual under arrest and took him to the motel where Jensen identified him. He was transported to the Minnehaha County Jail and booked under the name Carlos Hernandez. An FBI check of his fingerprints revealed the name Rodolpho Hernandez. Law enforcement ultimately determined that his name was Kevin Bal-lesillo Selalla.
[¶ 13.] Law enforcement obtained a search warrant for the Ford Explorer. Inside the vehicle they discovered a digital scale containing traces of methamphetamine. Law enforcement also found the original Best Western receipt issued to Carlos Hernandez on July 26, 2005. Selal-la was charged and later indicted by a Minnehaha County grand jury for possession of methamphetamine with intent to distribute in violation of SDCL 22-42-2, possession of methamphetamine in violation of SDCL 22-42-5, and false impersonation with intent to deceive law enforcement in violation of SDCL 22-40-1.
[¶ 14.] Although he had conversed with various individuals in English on the day prior to his arrest in Sioux Falls, Selalla claimed he was not fluent in English to the point where he could understand what was going on during the jury trial on the charges pending against him. Prior to the trial, the trial court hired an interpreter to provide simultaneous translation of the proceedings. The Public Defender’s Office, which represented Selalla, hired its own Spanish interpreter, at public expense, to aid communication at trial between defense counsel and Selalla. On January 3, 2004, immediately before the trial commenced, the trial court dismissed the interpreter that it had hired for simultaneous translation, noting that Selalla was the only person in the courtroom who needed an interpreter and that the services of one taxpayer financed interpreter were sufficient under the circumstances.
[¶ 15.] After the jury was seated, the trial court handed out the preliminary instructions to the jury stating that it “use[d] the same preliminary instructions in every single trial, [and that] they don’t change because the jobs don’t change.” The court further stated that specific instructions of the law relevant to the instant case would be given at the end of the trial before deliberations began. The trial court went on to point out that state law, nevertheless, required it to read the preliminary instructions to the jury. Without objection from defense counsel, the trial court elected not to have the preliminary instructions translated for Selalla, stating that they could be read to him later.
[¶ 16.] During the defense case-in-chief, Selalla sought to call Duprey to testify to self-inculpatory statements made by Vallejo [1] about dealing drugs and her belief that she would test positive for drug-use if she submitted a urine sample. Selalla also intended to question Duprey about the fact that $100, of what law enforcement believed to be drug money, had been returned to Vallejo, after which she was released. The trial court explained that this line of questioning would “open the door” to the contextual and explanatory *807 evidence from Vallejo’s statements inculpating Selalla as a drug dealer and the reason that she had been released — because she was cooperating with law enforcement in Omaha and Sioux Falls who were investigating drug dealers. While objecting to the trial court’s position, defense counsel elected not to question Du-prey on the matter of Vallejo’s self-incul-patory statements.
[¶ 17.] The trial concluded on January 4, 2006, with the jury returning guilty verdicts on all three counts. Selalla now appeals raising two issues:
1. Whether the trial court abused its discretion by its decisions regarding interpreters, therein resulting in a violation of Selalla’s constitutional or statutory rights.
2. Whether the trial court abused its discretion regarding its decision as to the admissibility of hearsay evidence.
STANDARD OF REVIEW
[¶ 18.] When there is an assertion of a violation of a constitutional right, we review under the de novo standard. State v. Ball, 2004 SD 9, ¶21, 675 N.W.2d 192, 199 (quoting State v. Hodges, 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209 (citations omitted)). We review the trial court’s implementation of courtroom procedures under the abuse of discretion standard. State v. Alidani, 2000 SD 52, ¶¶ 15-19, 609 N.W.2d 152, 157-58 (applying the abuse of discretion standard during the review of a trial court’s decision to allow a victim-witness assistant to hold the hand of a child victim of sexual abuse during the child’s testimony); State v. Daniel, 2000 SD 18, ¶¶ 10-13, 606 N.W.2d 532, 534-35 (applying the abuse of discretion standard during the review of a trial court’s examination of prospective jurors on various topics during voir dire); State v. Damm, 62 S.D. 123, 252 N.W. 7, 10 (1933) (applying the abuse of discretion standard during the review of a trial courts decision to clear spectators from the courtroom during the testimony of a 13-year-old victim of second degree rape).
To preserve issues for appellate review litigants must make known to trial courts the actions they seek to achieve or object to the actions of the court, giving their reasons. SDCL 23A-44-13. Issues not advanced at trial cannot ordinarily be raised for the first time on appeal. Where error has not been preserved by objection or otherwise, our inquiry is limited to whether the court committed plain error. “Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court.” SDCL 23A-44-15 (Rule 52(b)). Unlike harmless error review under SDCL 23A-44-14 (Rule 52(a)), in which the State has the burden of proving the error was not prejudicial, with plain error analysis the defendant bears the burden of showing the error was prejudicial.
State v. Nelson 1998 SD 124, ¶7, 587 N.W.2d 439, 443 (additional internal citations omitted). “We invoke our discretion under the plain error rule cautiously and only in ‘exceptional circumstances.’ ” Id. ¶ 8 (citations omitted). “The trial court’s evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion.” Kaiser v. University Physicians Clinic, 2006 SD 95, ¶ 29, 724 N.W.2d 186, 194 (citations omitted).
ANALYSIS AND DECISION
[¶ 19.] 1. Whether the trial court abused its discretion by its decisions regarding interpreters, therein resulting in a violation of Selalla’s constitutional or statutory rights.
[¶ 20.] Selalla asserts that the trial court’s decisions to proceed with one inter *808 preter instead of two and not translate the preliminary jury instructions, but rather to have them read to him at a later time violated South Dakota law, under SDCL 23A-39-1, which requires a criminal defendant to be present at all stages of a trial. Selalla also asserts that his right to a fair trial guaranteed under the Due Process Clause of Article VI, Section 2 of the South Dakota Constitution, and the Fifth and Fourteenth Amendménts of the United States Constitution have been violated. In addition, Selalla contends that his right to counsel, to be present at trial and to confront witnesses guaranteed under Article VI, Section 7 of the South Dakota Constitution and the Sixth and Fourteenth Amendments of the United States Constitution have been violated. Since this Court has not addressed the nature and scope of a defendant’s right to an interpreter as provided by SDCL 23A-22-11 (Rule 28),[2] the issue presented by Selalla is one of first impression.

The Trial Court’s Decision to Dismiss One Interpreter.

[¶ 21.] Clearly, a criminal defendant’s ability, or lack thereof, to understand the English language and the ruling of the trial court, as to whether an interpreter should be provided for the defendant, implicates the constitutional rights of due process, confrontation of witnesses, and effective assistance of counsel. See generally United States v. Johnson, 248 F.3d 655 (7th Cir.2001); United States v. Carrion, 488 F.2d 12 (1st Cir.1973), cert, denied, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974); United States v. Gallegos-Torres, 841 F.2d 240 (8th Cir.1988); United States ex rel. Negron v. New York, 434 F.2d 386 (2d Cir.1970); People v. Escalante, 256 Ill.App.3d 239, 194 Ill.Dec. 580, 627 N.E.2d 1222 (1994); People v. Gutierrez, 177 Cal.App.3d 92, 222 Cal.Rptr. 699 (1986). Nevertheless, as a function of courtroom procedure, we observe that trial courts have been given broad discretion when making this determination. See United States v. Khehra, 396 F.3d 1027, 1030 (8th Cir.2005) (citing United States v. Coronel-Quintana, 752 F.2d 1284, 1291 (8th Cir.1985); Luna v. Black, 772 F.2d 448, 451 (8th Cir.1985)); United States v. Gonzales, 339 F.3d 725, 727 (8th Cir.2003); (acknowledging that the appointment of an interpreter lies within a trial court’s discretion) (citations omitted); Martins v. State, 52 S.W.3d 459, 471 (Tex.Ct.App.2001); In re Raymundo B., 203 Cal.App.3d 1447, 250 Cal.Rptr. 812, 815 (1988); State v. Grubbs, 117 Ariz. 116, 570 P.2d 1289, 1292 (Ct.App.1977); see also Carrion, 488 F.2d at 14-15 (noting that the trial court should have “wide discretion” when determining whether to appoint an interpreter because of the variety of factors that enter into the decision, including the defendant’s ability to understand English, and the complexity of the proceedings, issues and testimony) (citing Perovich v. United States, 205 U.S. 86, 91, 27 S.Ct. 456, 51 L.Ed. 722 (1907); United States v. Barrios, 457 F.2d 680 (9th Cir.1972); United States v. Sosa, 379 F.2d 525, 527 (7th Cir.1967), cert, denied, 389 U.S. 845, 88 S.Ct. 94, 19 L.Ed.2d 111 (1967)); Luna, 772 F.2d at 451 (8th Cir.1985) (quoting Carrion, 488 F.2d at 14-15); Johnson, 248 F.3d at 664 (7th Cir.2001) (recognizing that as a constitutional matter the appointment of an interpreter is within the trial court’s discretion).
[¶ 22.] Since this case presents an issue of first impression, we review with interest federal appeals court opinions on the right *809 to interpreters. In 1978, the United States Congress passed the Court Interpreters Act, 28 USC §§ 1827, 1828(CIA), requiring that federal courts appoint interpreters under certain conditions and establishing statutory guidelines for their use to ensure that the quality of translation does not fall below a constitutionally permissible threshold. Johnson, 248 F.3d at 661 (citations omitted). Under the CIA, a defendant is only entitled to an interpreter if he “speaks only or primarily a language other than the English language” and that fact inhibits his “comprehension of the proceedings or communication with counsel.” Id. (quoting 28 USC § 1827(d)(1)). The CIA requires the trial court to evaluate a variety of factors including the defendant’s ability to understand English, the complexity of the proceeding and the testimony. Id. (quoting United States v. Febus, 218 F.3d 784, 791 (7th Cir.2000)).
[¶ 23.] In light of the facts in this case we note Carrion and Johnson with particular interest. Although Carrion predated the CIA by five years, we still find it to be instructive.[3] See Carrion, 488 F.2d at 14-15 (recognizing the same evaluation factors as mandated by the subsequent CIA). In that case, the defendant had limited English speaking and comprehension skills. Carrion, 488 F.2d at 15. On appeal, the defendant alleged that the trial court should have held a formal competency hearing to determine if he needed an interpreter. Id. Moreover, the trial court refused the defendant’s request to allow an interpreter for one of his two co-defendants’s to sit between the defendant and the co-defendant on the ground that that would be unworkable. Id. at 15. However, the court of appeals upheld the defendants conviction noting that the trial court told him that if at any point during the trial there was something he did not understand, he needed only to raise his hand and the testimony would be repeated. Id. at 15.
[¶ 24.] In Johnson, the trial court appointed one interpreter to simultaneously translate the proceedings to the four defendants. Johnson, 248 F.3d at 659. The defendants objected to this arrangement because they could only communicate with their respective attorneys, through the one interpreter, during breaks in testimony, thus denying them the ability to simultaneously communicate with their attorneys. Id. at 662. In upholding the defendant’s convictions, the Johnson court opined, “The CIA provides for simultaneous interpretation of the proceedings, not simultaneous interpretation of attorney-client communications. As long as the [trial] court, when put on notice, adopts a solution that removes the inhibition on communication with counsel, we cannot say that the [trial] court abused its discretion.” Id. at 663.
[¶ 25.] Johnson is also instructive for other cases that it cites. See id. at 662-63 (citing United States v. Sanchez, 928 F.2d 1450, 1454-56 (6th Cir.1991) (abrogated on other grounds by United States v. Jackson-Randolph, 282 F.3d 369 (6th Cir.2002)) (holding that the CIA authorizes the appointment of one interpreter in multi-defendant trials and finding no abuse of discretion where each of two defendants had a court-appointed interpreter to aid in communication with counsel and the trial court borrowed one of the interpreters in order to translate witness testimony, and the defendants consequently argued they *810 had been prevented from effectively communicating with counsel); United States v. Bennett, 848 F.2d 1134, 1139-41 (11th Cir.1988) (superseded on other grounds by Rule as stated in United States v. Moore, 504 F.3d 1345 (11th Cir.2007) (holding that the trial court’s appointment of a single interpreter to provide simultaneous translation of the proceedings in a multi-defen-dant trial satisfied the requirements of the CIA; that nothing in the act required the trial court to appoint additional interpreters to translate communications between the defendants and their attorneys; and that the trial' court thereby acted within its discretion when it refused to do so, but offered to recess the trial at any time the defendants needed to consult with their attorneys)); see also United States v. Yee Soon Shin, 953 F.2d 559, 561 (9th Cir.1992) (finding no error when trial court appointed one interpreter for two defendants and holding that the CIA does not require separate interpreters for each defendant in multi-defendant cases); United States v. Lim, 794 F.2d 469, 471 (9th Cir.1986) (finding no error where communication with counsel was by means of notes and during breaks)).
[¶ 26.] We also find instructive a number of cases from other jurisdictions. So too in these cases, trial courts have been granted broad discretion when making decisions about whether to appoint interpreters. However, the record must reflect some basis upon which the trial court exercised this discretion before its decision can be affirmed on appeal. In conducting this review, we observe that the refusal below to appoint an interpreter may be upheld where there is evidentiary support for a finding that the defendant is sufficiently fluent in English or the record is otherwise indicative of the defendant’s English competency. '
[¶ 27.] There is perhaps no better indication for an appeals court that a defendant can speak and understand English than when the record reflects that he gave testimony or offered some other oral statement. See Larias v. State, 528 So.2d 944, 944 (Fla.Dist.Ct.App.1988) (affirming the decision below not to appoint an interpreter, concluding that the trial court’s- oral finding was supported, in part, by the record. of extensive colloquies between the trial court and the defendant); Gonzales v. State, 182 Ga.App. 594,, 356 S.E.2d 545, 546 (1987) (holding that the trial court did not abuse its discretion where the defendant gave testimony that revealed he had a sufficient command of English to participate meaningfully in the proceedings without an interpreter); People v. Lopez, 114 Ill.App.3d 1018, 70 Ill.Dec. 580, 449 N.E.2d 927, 934 (1983) (affirming the trial court’s refusal to appoint an interpreter, in part, on the defendant’s testimony as to his English competency); State v. Ngoc Van Vu, 339 N.W.2d 892, 897 (Minn.1983) (affirming the defendant’s conviction and noting his extensive hearing testimony without an interpreter); Johnson v. State, 512 So.2d 1246, 1250, 1256 (Miss.1987) (affirming the trial court’s decision not to provide an interpreter for defendants, concluding that its informal finding that they “were fluent and conversant in English and appeared to have no trouble understanding it,” was supported, in part, by transcripts from a previous trial and the trial at bar that reflected the defendants’ ability to understand English); State v. Topete, 221 Neb. 771, 380 N.W.2d 635, 636 (1986) (affirming the trial court’s refusal to appoint an interpreter based, in part, on the defendant’s English competency, exhibited in testimony at a fluency hearing and at trial); State v. Drobel, 815 P.2d 724, 737 (Utah Ct.App.1991) (affirming the pro se defendant’s conviction and the trial court’s refusal to appoint interpreters based, in *811 part, on the trial transcript indicating that the defendant had no difficulty communicating with the trial court in English); Cantu v. State, 716 S.W.2d 688, 690 (Tex.Ct.App.1986) (where the trial court did not order an interpreter to be present for the entire proceeding, affirming the defendant’s conviction and sentence based on his English competency as demonstrated in the transcript of his testimony); see also Vargas v. State, 627 S.W.2d 785, 787 (Tex.Ct.App.1982) (affirming the trial court’s refusal to provide an interpreter for the defendant’s testimony where the transcript revealed that he was able to testify in English without difficulty).
[¶ 28.] The reviewing court may justify affirming the decision not to appoint an interpreter based on witness testimony relevant to that issue. See Larias, 528 So.2d at 944 (affirming the decision below, concluding that the trial court’s oral finding was supported, in part, by an interpreter’s opinion testimony that the defendant spoke “ ‘just about perfect English’ ”); Topete, 380 N.W.2d at 636 (Neb.1986) (affirming the trial court based, in part, on the transcript of testimony from a law enforcement officer that he had conversed with the defendant, in English, for over an hour following the arrest).
[¶ 29.] Courts have also found a record of background information about the defendant as supportive of the trial court’s decision not to appoint an interpreter. See Lopez, 70 Ill.Dec. 580, 449 N.E.2d at 934 (affirming the decision below based, in part, on the trial court’s statement, for the record, that the defendant was born in Texas and educated in America, served in the United States Army and had been a county employee for ten years); People v. Boehm, 309 N.Y. 362, 130 N.E.2d 897, 899 (1955) (affirming a lower appellate court’s reinstatement of conviction where the decision was supported by record evidence that the defendants had lived in and worked throughout the United States for nine years); Drobel, 815 P.2d at 737 (affirming a pro se defendant’s conviction based, in part, on his acknowledgment that he was schooled in English and had used it both to conduct business and as United States resident for the previous seven years).
[¶ 30.] In other cases the decision not to appoint an interpreter has been supported by the trial court’s statement as to its observations of the defendant. See State v. Perez, 404 N.W.2d 834 (Minn.Ct.App.1987) (holding that the trial court’s finding, that the defendant had sufficient command of the English language such that he did not need simultaneous interpretation of the proceedings, was supported by its having heard the defendant’s taped confession and testimony at another proceeding); Johnson, 512 So.2d at 1251 (affirming the decision below and concluding that the trial court’s findings were supported, in part, by its observations of the defendant, evincing his English competency); State v. Trevino, 10 Wash.App. 89, 516 P.2d 779, 784 (1973) (affirming the defendant’s conviction and noting the trial court’s statement for the record, observing that the defendant could “express himself very well” and “had no difficulty testifying”); see also State v. Mendez, 56 Wash.App. 458, 784 P.2d 168, 170 (1989) (affirming the trial court’s refusal to vacate a sentence where it stated for the record that the defendant obviously “understood the proceedings,” and that it had no doubt that the defendant’s guilty plea was entered “with full knowledge of [his] constitutional rights”).
[¶ 31.] In the instant case, the Public Defender’s Office arranged for an interpreter to be present to facilitate communication between defense counsel and Selal-la, while the trial court arranged for a *812 second interpreter to provide simultaneous translation of the court proceedings. However, immediately prior to the commencement of trial, the trial court dismissed the simultaneous translator. The trial court did not conduct a fluency hearing to determine the extent of Selalla’s English comprehension, nor did it enter findings either written or oral in support of its determination that the second interpreter was unnecessary. Moreover, the trial court did not even make an informal comment for the record as to any observation relative to Selalla’s ability to understand English. The only justification offered by the trial court for its dismissal of the simultaneous translator was its statement: “[T]he point of paying for two interpreters’ flies by me.”
[¶ 32.] Despite the fact that the trial court made no attempt to support the dismissal by articulating some justification, we might still endorse the trial court’s decision were we to find an independent basis in the record to demonstrate that Selalla had no need of a second interpreter. However, no such basis is to be found in the record of this case. Selal-la did not testify. There are no demonstrative colloquies between the trial court and the defendant.[4] Furthermore, there is no history offered as to Selalla’s place of birth, education or work experience. The record does reflect that Jensen drove around Sioux Falls with Selalla for some time on the night of his arrest and that she does not speak Spanish. Also, the two front desk clerks that spoke to Selalla at the Empire Best Western Towers, Ashley Thiry and Beverly Weyer, and arresting officer Flogstad, all testified to having conversations with Selalla. However, the transcript of testimony as to these conversations falls short of forming a basis to support the trial court’s dismissal of the second interpreter. Accordingly, since the trial court entered no findings, nor made any statement for the record as to Selal-la’s English competency and we find no independent evidentiary support justifying its dismissal of the second interpreter; we conclude this decision was an abuse of discretion.
[¶ 33.] Nevertheless, we will not reverse the trial court unless Selalla can show that he was unduly prejudiced as a result of the trial court’s decision to dismiss the second interpreter. See State v. Saldana, 310 Minn. 249, 246 N.W.2d 37, 39 (1976) (holding that there was no basis to set aside the defendant’s conviction where the defendant failed to show any prejudicial effect on his ability to offer a defense due to the absence of an interpreter); Perez 404 N.W.2d at 838; Carrion, 488 F.2d at 15 (affirming the defendant’s conviction where the trial court did not appoint an interpreter for him, but offered to repeat testimony at any time the defendant requested). See also Vargas, 627 S.W.2d at 786 (affirming the judgment below and noting that after the trial court indicated it would provide the defendant an interpreter for his testimony if he “gets into trouble,” the defendant thereafter gave his testimony without difficulty and made no further requests for an interpreter).
[¶ 34.] When defense counsel objected to the trial court’s dismissal of the second interpreter, on the ground that he and Selalla would not be able to freely commu- *813 rúcate,[5] the trial court responded as follows:
I will work with you [defense counsel] and take a recess, ... if you need to visit with your client, just state that to me because you can’t listen to the witnesses, and your client can’t listen to the witnesses while talking. If you need to visit, just state that to me and I’ll be glad to stop the testimony and give you an opportunity to do that.
(Emphasis added).
[¶ 35.] The trial court extended an offer to stop the proceedings at any time Selalla or defense counsel felt the need to confer. This is relevant to the claim of Selalla that his constitutional right to counsel and confront witnesses was violated by the trial court’s Spanish translation arrangements. Specifically, on not one occasion during the proceedings did either Sel-alla or defense counsel take the trial court up on its offer to suspend the proceedings so that they might counsel together. In light of this fact we find no basis upon which to conclude that Selalla was in any way prejudiced by the trial court’s error in dismissing the second interpreter.

The Trial Court’s Decision not to have the Preliminary Jury Instructions Translated at the Time They Were Read to the Jury.

[¶ 36.] Because he raised no objection at the time, Selalla now argues plain error, implicating a constitutional violation by the trial court, in deciding not to have the interpreter translate the preliminary jury instructions for Selalla at the time they were read to the jury, but rather to have the interpreter read them to Selalla at a later time.
[¶ 37.] “Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it ‘seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.’ ” Nelson, 1998 SD 124, ¶ 8, 587 N.W.2d at 443 (quotations omitted) (alteration in original). Selalla bears the burden of showing that any such error was prejudicial. Id. ¶ 7.
[¶ 38.] Prior to its decision regarding the real-time translation of the preliminary jury instructions, the trial court passed out copies of the instructions to each juror and stated:
I hope that these will give you some guidelines as to what your job is and what my job is. I use the same preliminary instructions in every single trial, they don’t change because the jobs don’t change. At the end of the trial, I am going to give you jury instructions that are specific to this case ....
(Emphasis added).
[¶ 39.] The State concedes that the trial court erred by not having the interpreter translate the generic preliminary instructions at the time they were given to the jury and that the error is plainly on the record. The State also submits that Selalla may have had statutory and constitutional rights to be present during the reading of the preliminary jury instructions; and that these rights may have been violated by the trial court’s decision, thus, potentially affecting a substantial right. We do not need to address these questions because Selalla has failed to show any prejudice conceivably affecting the outcome of the jury’s verdict as a result of the trial court’s decision to forego the real-time translation of the generic *814 preliminary instructions. Accordingly, we find no plain prejudicial error.
[¶ 40.] 2. Whether the trial court abused its discretion regarding its decision on the admissibility of hearsay evidence.
[¶ 41.] Selalla sought to elicit testimony from Duprey as to Vallejo’s admissions that she was a drug dealer and would fail a urine test. The trial court refused to allow this line of exculpatory questioning, unless the State was allowed to open the door to elicit Duprey’s testimony as to Vallejo’s remarks inculpating Selalla in drug distribution in Sioux Falls. Selalla asserts that the trial court’s evidentiary ruling in this regard was an abuse of discretion. Selalla argues that the former are admissible as statements against interest by an unavailable declarant, and thus hearsay exceptions as provided under SDCL 19-16-32 (Rule 804(b)(3)).[6] On the other hand, Sel-alla claims that the later remark is not admissible under Rule 804(b)(3), and further, in the wake of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) is barred as a testimonial statement by an unavailable declarant in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. In addition to Crawford, Selalla also cites Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), United States v. Chapman, 345 F.3d 630 (8th Cir.2003); and United States v. Hazelett, 32 F.3d 1313 (8th Cir.1994) as supportive of his claim.
[¶ 42.] In Williamson, the declarant was found to be in possession of a large amount of cocaine following a routine traffic stop. 512 U.S. at 596, 114 S.Ct. at 2433, 129 L.Ed.2d 476. During a statement made to a DEA agent, the declarant implicated himself as a courier in a drug trafficking scheme along with an unidentified accomplice and the defendant. Later, the declarant disavowed part of his story, while continuing to implicate the defendant as an accomplice. 512 U.S. at 597, 114 S.Ct. at 2433, 129 L.Ed.2d 476. The de-clarant was unavailable to testify at trial. Id. at 597, 114 S.Ct. at 2434, 129 L.Ed.2d 476.
[¶ 43.] Under the Rule 804(b)(3) hearsay exception, the government offered the DEA agent’s testimony, as to the declar-ant’s confession, implicating the defendant in the scheme, in addition to those parts of the declarant’s statement in which he implicated himself. Id. at 597-98, 114 S.Ct. at 2434, 129 L.Ed.2d 476. The defendant was ultimately convicted on the strength of the DEA agent’s hearsay testimony. The United States Supreme Court overturned the conviction. Id. at 605, 114 S.Ct. at 2437-38, 129 L.Ed.2d 476. The Court held that under Rule 804(b)(3), those parts of an unavailable declarant’s statement that inculpate a third party are not properly admitted as evidence, against the third party as part of a holistic statement that includes those parts in which the declarant inculpates himself. Id. at 604, 114 S.Ct. at 2437, 129 L.Ed.2d 476. The Court reasoned that the character of being against penal interest that tends to make a self- *815 inculpatory statement indicative of truthfulness and thus admissible under Rule 804(b)(3), does not cloak a statement inculpating a third party, made in proximity with the self-inculpatory statement, in the same truthfulness. Id. at 600-01, 114 S.Ct. at 2435, 129 L.Ed.2d 476. In analyzing this issue, the Court observed that the advisory committee notes to Rule 804(b)(3) noted that such statements might simply be made to curry favor with law enforcement. Id. at 601, 114 S.Ct. at 2436, 129 L.Ed.2d 476 (quoting Rule 804(b)(3), advisory committee notes exception (3)).
[¶ 44.] The facts in Hazelett parallel those in Williamson. Again, the government apprehended a declarant who implicated herself as a courier in a drug trafficking scheme along with the defendant. Id. at 1314-15. The declarant was later unavailable to testify at the defendant’s trial. Id. at 1315. The government offered her entire statement under Rule 804(b)(3) including those parts that inculpated the defendant. Citing the holding in Williamson, the trial court overturned the defendant’s conviction. Id. at 1318-19.
[¶ 45.] Although the defendant’s conviction was upheld in Chapman on the strength of other evidence, the facts in this case too, were much like those in Williamson and Hazelett. See Chapman, 345 F.3d at 632. While citing Williamson in finding the trial court erred by admitting the government’s hearsay testimony inculpating the defendant under Rule 804(b)(3), the trial court stated, “by [the declarant] casting himself as a mere mule and serving up [the defendant as the] repeat buyer [of large quantities of marijuana], [the declar-ant] could reasonably assume that he would be minimizing his criminal liability.” Id. at 633 (citation omitted).
[¶46.] Prior to the holding in Crawford, the door was left ajar by Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (overruled by Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177), which conditioned the admissibility of all hearsay on whether it fell under a “firmly rooted hearsay” exception or bore “particularized guarantees of trustworthiness.” Id. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d 597. Thus, if a declar-ant’s statement did not fall within some “firmly rooted hearsay exception,” it might still be admissible if it were judicially determined to bear adequate “indicia of reliability.” However, Crawford overruled Roberts holding that where an out-of-court statement by a witness is testimonial, it is barred, under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statement is deemed reliable by the trial court. Crawford, 541 U.S. at 67, 124 S.Ct. at 1373, 158 L.Ed.2d 177. Crawford, included statements given during thp course of a police interrogation as those that fall within the ambit of those considered to be “testimonial.”[7] 541 U.S. at 52, 124 S.Ct. at 1364, 158 L.Ed.2d 177.
*816 [¶ 47.] Crawford, however, is not an absolute bar to out-of-court testimonial statements made by an unavailable de-clarant whom the defendant had no prior opportunity to cross-examine. The case of State v. Prasertphong, (Prasertphong II), 210 Ariz. 496, 114 P.3d 828 (2005) is illustrative of this point. Prasertphong II involved a case of two co-defendants tried and convicted for the robbery-murder of three pizza-parlor employees. Id. at 829. The declarant made self-inculpatory statements, admitting to all three murders, and also inculpated the defendant by alleging acts that attributed substantial responsibility in the crime to the defendant. Id. at 829-30. At trial, the defendant, under Arizona’s version of Rule 804(b)(3), sought to admit only the self-inculpatory portions of the declarant’s written statement that tended to exculpate the defendant. Id. at 829. The prosecution agreed that these statements where admissible. However, the prosecution argued that under Arizona’s version of the “rule of completeness”, Rule 106,[8] those parts of the co-defendant’s statement, inculpating the defendant should also be admitted if the defendant sought to introduce into evidence those statements that tended to exculpate him. Id. at 829-30. The defendant in Prasertphong II argued that admitting the whole statement including those inculpating him in the crime violated his Sixth Amendment right to confrontation. Id. at 830. The trial court disagreed with the defendant citing Rule 106.
[¶ 48.] In affirming the judgment, the Arizona Supreme Court pointed out the limitation of the holding in Crawford. Id. at 834. The court acknowledged that while a statement may be admissible under a hearsay exception, it still may run afoul of Confrontation Clause requirements. Id. at 831 (citations omitted). Significantly for our analysis of the instant case, the court noted that because the defendant proffered selected portions of the co-defen *817 dant’s statement, his Sixth Amendment right to confrontation was not implicated.
[¶ 49.] In analyzing the “rule of completeness” the Arizona court noted that the language of Rule 106 does not mandate that an entire statement necessarily be admitted, but rather those parts that are “necessary to explain or place into context the portion already introduced.” Id. (citing United States v. Branch, 91 F.3d 699, 728 (5th Cir.1996) (quoting United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir.1988))). As a consequence, the court held that when a defendant makes the tactical decision to admit a fragmentary part of an accomplice’s conversation under Rule 804(b)(3), the government cannot simultaneously be precluded from introducing other evidence from the conversation. Id. at 832 (citing State v. Soto-Fong, 187 Ariz. 186, 928 P.2d 610, 618 (1996)) (holding that a defendant’s introduction of an informant’s statement to police recounting a conversation with an accomplice, who made self-inculpatory statements, precluded the defendant from resisting the prosecution’s introduction of a statement, made during the same conversation, that inculpated the defendant). The court then observed its holding was consistent with other jurisdictions’ and federal courts’ interpretations of “the rule of completeness.” Id. at 832-33 (citing State v. Roberts, 142 Wash.2d 471, 14 P.3d 713, 718 (2000)); Ramirez v. State, 739 So.2d 568, 580 (Fla.1999); Carr v. State 655 So.2d 824, 835 (Miss.1995); Kennard v. State, 531 So.2d 934, 935, 937 (Ala.1986); Burke v. State, 484 A.2d 490, 496-97 (Del.1984); United States v. Moussaoui, 382 F.3d 453, 481-82 (4th Cir.2004); United States v. Washington, 12 F.3d 1128, 1137 (D.C.Cir.1994).
[¶ 50.] Finally, the Arizona court cited Crawford itself for the proposition that Rule 106 stands intact post-Crawford, as an exception to the Confrontation Clause, because the admittance of evidence under the “rule of completeness” is not predicated on a showing of reliability.
[T]he Roberts test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.
Id. at 834 (emphasis added) (citing Crawford, 541 U.S. at 62, 124 S.Ct. at 1354, 158 L.Ed.2d 177 (citation omitted)).
[¶ 51.] The facts of the instant case parallel those of Prasertphong II. The absent Vallejo’s statement, made to Duprey during the course of his interrogation, was clearly testimonial as defined by Crawford. Selalla sought to elicit the exculpatory parts through Duprey’s testimony. The trial court agreed to allow this line of questioning under our Rule 804(b)(3). However, consistent with our Rule 106, it determined that it would also allow the State to “complete the picture” by eliciting testimony from Duprey about Vallejo’s statements inculpating Selalla in the Sioux Falls drug trade. In the context of Vallejo’s admissions and her arrest in a motel room she had rented with Selalla, which contained substantial quantities of methamphetamine and drug paraphernalia, her statement inculpating Selalla in the drug trade was explanatory as to why he had a scale for measuring drugs in his vehicle and was obviously trying to evade *818 police that were waiting for him at the motel late on the night of July 26, 2005. Nevertheless, Selalla objected claiming that the ruling violated his Sixth Amendment right to confrontation. Selalla now has offered Williamson, Hazelett, Chapman and Crawford, to support this claim that the “rule of completeness” is subordinate to his right-to confrontation.
[¶ 52.] What Selalla overlooks is that in each of those cases the prosecution introduced inculpatory hearsay evidence against a defendant. Those cases are distinguishable from the case where a defendant seeks to use Rule 80J+ (b)(3) as a shield, to introduce exculpatory parts of an unavailable declarants statement, while simultaneous using the Confrontation Clause as a sword, as was attempted previously by the defendant in Prasertphong II and again today by Selalla, to exclude those parts that inculpate the defendant. Prasertphong II, 114 P.3d at 834-35 (citations omitted). If this Court were to reverse Selalla’s conviction on these grounds, we would eviscerate the “rule of completeness.” The result would be to set up unfair outcomes arising out of not-so-hypothetical scenarios such as that of the de-clarant who confesses to the police that he murdered two people, but then subsequently, during the same interview, says that the defendant forced him to do it. Applying Rule 804(b)(3), the defendant could introduce the first portion of the declarant’s statement to the police because it was a statement against interest; then trumping the State’s right to introduce the second statement under Rule 106 by invoking the Confrontation Clause under the banner of Crawford. See id. We refuse to establish that unfair precedent. Accordingly, we find that the trial court acted within its discretion in ruling that the introduction of favorable hearsay by Selalla would properly enable the State to complete the picture by eliciting other evidence from the rest of Vallejo’s statement to Duprey.
[¶ 53.] Affirmed.
[¶ 54.] MEIERHENRY, Justice, concurs.
[¶ 55.] SABERS and ZINTER, Justices, concur specially.
[¶ 56.] KONENKAMP, Justice, dissents.

. By the time of trial, Vallejo’s whereabouts were unknown, except that Duprey testified that he believed her to be somewhere in Omaha, Nebraska.

. SDCL 23A-22-11 (Rule 28) provides:
A court may appoint an interpreter or translator of its own selection and may set reasonable compensation for him.

. Beyond our recitation of the facts in Carrion, we also note with interest that court’s statement in reference to a defendant who has difficulty understanding English, "that he has a right to a court-appointed interpreter if the court determines that one is needed....” 488 F.2d at 14 (emphasis added).

. There was, however, a short exchange between the trial court and Selalla at the close of the State’s case. At that point Selalla was advised of his right to testify in his own defense or remain silent. Selalla replied with one word answers to most of the trial court’s five lengthy questions. Selalla did not indicate any inability to understand what was being said by the trial court.

. Selalla’s argument to this Court is limited to an assertion of abuse of discretion by the trial court. No claim of a breach of the attorney-client privilege by the use of his interpreter to translate for him during the court proceedings is raised.

. SDCL 19-16-32 (Rule 804(b)(3)) provides:
A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true, is not excluded by § 19-16-4 if the declarant is unavailable as a witness. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

. In Crawford, the Court endeavored to establish context for the term "testimonial.'' 541 U.S. at 51-53, 124 S.Ct. at 1364-65, 158 L.E.2d 177. The Court opined that testimonial statements included:
“ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,” "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,” "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]” These formulations all share a common nucleus and then define the Confrontation Clauses coverage at various lev *816 els of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition-for example, ex parte testimony at a preliminary hearing. Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not sworn testimony, but the absence of oath was not dispositive.... Under the Marian statutes, witnesses were typically put on oath, but suspects were not. Yet Hawkins [in 2 W. Hawkins, Pleas of the Crown, ch. 46, § 3, pp. 603-604 (T. Leach 6th ed. 1787)] and others went out of their way to caution that such unsworn confessions were not admissible against anyone but the confessor.
That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. England did not have a professional police force until the 19th century, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace. In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.
Id. (internal citations omitted) (first and third emphasis added, second emphasis original).

. SDCL 19-9-13 (Rule 106) is functionally identical to Arizona’s version of Rule 106 and provides as follows:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.