NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2013-075


THE STATE OF NEW HAMPSHIRE

v.

THOMAS JUR


Argued: January 9, 2014
Opinion Issued: May 8, 2014


Joseph A. Foster, attorney general (Nicholas Cort, assistant attorney general, on the brief and orally), for the State.

James B. Reis, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. Following a jury trial, the defendant, Thomas Jur, was convicted of operating a motor vehicle while certified as a habitual offender. RSA 262:23 (Supp. 2012). On appeal, he argues that the Superior Court (Delker, J.) erred by denying his pretrial request for an interpreter, thus violating his right to a fair trial and effective assistance of counsel under both the State and Federal Constitutions. In the alternative, the defendant argues that the trial court's failure to appoint an interpreter at trial sua sponte was error. We affirm.

I

The pertinent facts are as follows. In February 2012, the defendant was indicted on the habitual offender charge. On March 13, 2012, his defense counsel filed a motion requesting that the trial court provide the defendant with an interpreter. In support of the motion, counsel stated that the defendant is from Sudan, that his primary language is Dinka, and that he has difficulty understanding the English language. The State did not object. The trial court granted the motion on March 28, 2012.[1] On August 13, 2012, the clerk of court mailed a letter to a prospective interpreter, informing her of the need for her services and the dates of both the pretrial conference and the trial. However, as of November 26, 2012, the date the court held a final pretrial hearing, neither the court nor the parties had been able to secure a Dinka interpreter. The trial court had been notified of the lack of an interpreter a week prior to the hearing, and had informed defense counsel that it would engage in a colloquy with the defendant to determine whether he needed an interpreter for trial.

At the beginning of the hearing, both the State's attorney and defense counsel discussed their efforts to find an interpreter. The State stated that it had tried to contact two different organizations to secure an interpreter, but had been unable to reach either. Defense counsel stated that the defendant had identified an interpreter at one point – the individual whom the clerk of court attempted to contact via letter on August 13, 2012 – but had been unable to get in touch with her during the several months prior to the hearing.[2]

The court next engaged in a colloquy with the defendant to assess his English language abilities. It began by asking the defendant, "[T]here's some question about how much English you understand and I want to talk to you a little bit about that, okay?" The defendant assented, and the trial court asked a series of background questions: where the defendant was from; when he first came to the United States; whether he was a United States citizen; and where he had been living since he moved to New Hampshire. The defendant answered these questions with one-word or short responses. The trial court then asked

_____

[1] The State did not object to the motion for appointment of an interpreter, and it appears that the court granted the motion without conducting a hearing or making any specific factual findings regarding the defendant's need for an interpreter.

[2] Although the trial court's colloquy and determination on whether to proceed without an interpreter was apparently prompted by the difficulty in obtaining a Dinka language interpreter, we emphasize that we do not rely on this fact in concluding that the trial court did not err in proceeding to trial without one. Difficulty in obtaining an interpreter does not constitute a permissible basis for denial of an interpreter to a defendant who requires one in order to reasonably understand the proceedings and receive a fair trial, although it may inform a court's exercise of discretion in determining the manner in which necessary interpreter services will be provided.

whether the defendant had worked at any point. The defendant stated that he had done "a lot" of work and specified that, for example, he had been a machine operator in Manchester for six years. The colloquy continued as follows:

> THE COURT: Okay. So before you came to the United States, did you go to school in the Sudan?
>
> THE DEFENDANT: Yes.
>
> THE COURT: How long, how many years did you go to school there?
>
> THE DEFENDANT: Four or five years, and then I stopped because of war.
>
> THE COURT: Okay.
>
> THE DEFENDANT: And I go to Ethiopia.
>
> THE COURT: Okay.
>
> THE DEFENDANT: I started school for one year. I go in the army, then I stopped . . . .

The trial court next inquired about the defendant's native language, which the defendant stated was Dinka. The trial court asked whether the defendant had ever taken English language courses in Sudan or Ethiopia, to which the defendant responded, "No." The trial court then asked how he learned to speak English once he arrived in the United States:

> THE COURT: [D]id you take classes, English as a Second Language, or how did you go about learning English here?
>
> THE DEFENDANT: I go to the Congregation Church.
>
> THE COURT: Okay.
>
> THE DEFENDANT: In Manchester.
>
> THE COURT: All right. And do they have classes there?
>
> THE DEFENDANT: Yeah. Teacher Sue.
>
> THE COURT: Okay. And how long did you take those, how long did you go to those classes?

3

THE DEFENDANT: Sometime I go, sometime I'm working. Sometime I work that shift, so I sleep all day. Sometimes school is stopped for second shift. So maybe for two years.

The trial court next asked the defendant whether he understood the charges. The defendant responded in the affirmative, stating, "Yes, what happened." When asked to explain himself more particularly, the defendant stated, "I'm driving no license" and when asked, said that this was a crime because of a previous DUI. Based upon the defendant's response, the trial court then inquired into his past experience with the criminal justice system. In response to those questions, the defendant stated that he had had prior charges that had gone to trial. However, when asked whether there had been a jury of twelve people, the defendant stated "no" and, upon further questioning, explained: "My lawyer go and talk to the lady . . . and give him the paper I signed. That's it." The colloquy continued as follows:

THE COURT: Okay. Did you have an interpreter in those other cases, the past cases?

THE DEFENDANT: Yes.

THE COURT: Okay. And how about in talking with [defense counsel] in this case; have you and he used an interpreter or have you been able to talk to him without an interpreter?

THE DEFENDANT: Before we have one (indiscernible).

THE COURT: Okay.

THE DEFENDANT: But now I talk to him. I understand some of those words, but some big words I don't know. And he showed me example so I understand, yes.

THE COURT: Okay. All right. So it sounds like it takes a little bit of communication back and forth with you and [defense counsel] to understand all of the words that he's using; is that correct?

THE DEFENDANT: Yes, a lot.

When asked whether there were still things that the defendant did not understand, the defendant responded, "Yes, a little bit." The trial court asked some follow-up questions to determine what the defendant meant by this response, but stopped when the defendant's answers began to reveal trial strategy.

4

After speaking with the defendant, the trial court asked the State what its case consisted of in terms of witnesses and evidence. The State explained that it had two witnesses – the arresting officer and the hearings officer who certified the defendant as a habitual offender – and that their testimony would be "two hours at most." At this point, the trial court asked the defendant the following:

> Let me ask you this . . . . If I made sure that you had enough time to talk to [defense counsel], do you feel comfortable asking him, if there are things that the witnesses say that you don't understand, to be able to have time to consult with him about those issues to make sure you understand everything that's going on?

The defendant responded, "Yes." The trial court continued: "And if you have any questions along the way that he cannot answer for you, do you feel comfortable letting me know that you're having difficulty understanding what's happening in the trial?" Again, the defendant responded, "Yes." The trial court then asked defense counsel whether there was someone from his office who could assist him, so that the defendant could communicate with someone while defense counsel cross-examined witnesses. Defense counsel stated that he was sure he could find someone to assist him during trial. [3]

At that point, the trial court stated that the trial would proceed without an interpreter:

> I think that [in] talking to [the defendant] today that his English is sufficient to ensure that . . . his due process rights and his right to hear what the witnesses say and understand what they say can be protected by making sure we conduct this trial in a way that he has an adequate opportunity to talk with [defense counsel] and/or anyone who is helping him to make sure the Defendant understands all the issues. . . . But I think talking to [the defendant] I've been able to communicate, I think, with him quite effectively. . . . English isn't his first language, but he seemed to understand questions I've asked and I seem to understand his responses to those questions. And so I think given the fairly simple nature of these charges and the limited testimony that the State intends to introduce, that this case can go forward without an interpreter.

---

[3] The trial record reflects that defense counsel did have another person present to assist him and the defendant during the trial.

5

Defense counsel objected to the ruling, stating that an interpreter would be in the defendant's best interest. The trial court responded that it would make sure that defense counsel had "enough time between directs and crosses to talk or even if during the course of the testimony [the defendant] has questions that he wants to talk to you about or doesn't understand, we can break even during a direct or cross" so that defense counsel could address those issues. When defense counsel asked whether it had the trial court's permission to take breaks when necessary, the trial court responded, "Absolutely."

At the start of the trial, during its preliminary jury instructions, the trial court informed the jury that it would take more frequent breaks than usual because the defendant's native language was not English, and it wanted to ensure that defense counsel had enough time to confer with the defendant. After the trial court concluded its instructions, defense counsel –at the bench – stated that the defendant's understanding of the instructions was that "the jury should be listening to see if he's guilty or not guilty." However, defense counsel noted that the defendant did not understand what the trial court was saying as it was speaking, because it was speaking too fast. The trial court noted that counsel had received a written copy of the preliminary instructions prior to trial, and indicated that it would take a break to allow counsel to speak to the defendant about the instructions. The trial court also stated that it would be mindful to speak more slowly going forward, and reminded the State's attorney to do the same. The trial then commenced.

Several times during the trial, the rate of speech of the State's attorney and witnesses was identified as an issue. At the beginning of the first witness's testimony, defense counsel interrupted, approached the bench, and informed the trial court that the State's attorney was speaking too quickly. The State's attorney responded that she would slow her pace. In addition, the trial court also asked the witness to slow down, as he, too, was speaking very quickly. The witness agreed, and the direct examination continued. On another occasion, at the beginning of the direct examination of the second witness, the State's attorney asked the witness to slow down, acknowledging that she herself had also been speaking quickly. A few moments after the witness resumed her testimony, defense counsel asked the witness to slow down "a bit more." The witness agreed and completed her testimony without any further objections or interruptions from defense counsel.

The trial court asked defense counsel on three occasions whether he would like to recess to consult with the defendant: after the direct examination of the first witness; after the State rested; and before defense counsel began his redirect examination of the defendant. Defense counsel accepted all three offers.

6

The defendant testified in his own defense at trial. During direct examination, defense counsel inquired into how much he had understood of the testimony of the State's two witnesses:

> DEFENSE COUNSEL: Okay. By the way, Thomas, when you're sitting here and the police officer testified, did you understand most of what he said or some of what he said?
>
> DEFENDANT: A little bit.
>
> DEFENSE COUNSEL: A little bit.
>
> DEFENDANT: Yes.
>
> DEFENSE COUNSEL: Okay. When the [hearings officer] was testifying . . . did you understand what she was saying?
>
> DEFENDANT: A little bit.

In total, the defendant provided extensive testimony that spans sixty-three pages of transcript of the two-day trial.

Ultimately, the jury convicted the defendant of operating a motor vehicle after certification as a habitual offender. This appeal followed.

II

The defendant argues that the trial court's pretrial ruling to proceed to trial without a Dinka interpreter was error, as the colloquy showed that his ability to understand English was compromised to such an extent that an interpreter was necessary to protect his constitutional rights. He argues further that, even if the pretrial ruling was proper, the trial court erred by not appointing an interpreter during the trial, when the defendant's limited English proficiency became more "pronounced" and "obvious." For these reasons, the defendant asserts that the trial court violated his rights to a fair trial and effective assistance of counsel under Part I, Article 15 of the New Hampshire Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

We first address his claims under the State Constitution, and rely upon federal law only to aid our analysis. See State v. Ball, 124 N.H. 226, 231-33 (1983). Given that we have never specifically considered when a criminal defendant is constitutionally entitled to a court-appointed interpreter under the New Hampshire Constitution, that there is no state statute addressing the matter, and that the trial here took place prior to our recent adoption of the

7

New Hampshire Judicial Branch Language Services Plan,[4] we find the decisions of federal courts and other state courts addressing similar issues to be of great assistance to our analysis.

"As a constitutional matter, in determining whether an interpreter is needed, the trial court must balance the defendant's rights to due process, confrontation of witnesses, effective assistance of counsel, and to be present at his trial against the public's interest in the economical administration of criminal law."[5] United States v. Edouard, 485 F.3d 1324, 1338 (11th Cir. 2011) (quotation omitted). At one end of the spectrum, it is settled federal law that a foreign-born defendant who speaks fluent English and is "completely aware of all the proceedings" does not have a constitutional right to an interpreter. United States v. Carrion, 488 F.2d 12, 14 (1st Cir. 1973) (quotation omitted). At the opposite end of the spectrum, and notwithstanding that the United States Supreme Court has not specifically weighed in on the issue,[6] it seems equally clear that "a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter." United States v. Lim, 794 F.2d 469, 470 (9th Cir. 1986); see Carrion, 488 F.2d at 14 ("Clearly, the right to confront witnesses would be meaningless if the accused could not understand their testimony, and the effectiveness of cross-examination would be severely hampered."); Ko v. United States, 722 A.2d 830, 834 (D.C. 1998) ("When the accused cannot understand the proceedings, then the trial, to him, is no more than a babble of voices, and he cannot fairly be said to be present at his own trial.") (quotation and citation omitted); State v. Faafiti, 513 P.2d 697, 699 (Haw. 1973) ("It is general law that where a defendant cannot understand and speak English, the judge is required to appoint an interpreter . . . ."); Joung Youn Kim v. State, 331 S.W.3d 156, 162 (Tex. App. 2011) (explaining that a criminal defendant has a right to be

---

[4] See N.H. Sup. Ct. Order of Dec. 24, 2013, adopting the New Hampshire Judicial Branch Language Services Plan.

[5] A criminal defendant in federal court also has a statutory right to an interpreter under the Court Interpreters Act, 28 U.S.C. § 1827(d)(1)(2012), under the following circumstances:

> [I]f the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case) . . . speaks only or primarily a language other than the English language . . . so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer . . . .

[6] The United States Supreme Court has not recognized a constitutional right to a court-appointed interpreter, but has stated that whether to appoint an interpreter is a matter within the discretion of the trial court. United States v. Si, 333 F.3d 1041, 1043 n.3 (9th Cir. 2003); see Perovich v. United States, 205 U.S. 86, 91 (1907) (stating that the matter of appointing an interpreter "largely rest[s] in the discretion of the trial court").

8

present at his trial and that presence includes not only physical attendance but also comprehension of the proceedings).

We conclude that the rights afforded by the New Hampshire Constitution are consistent with the law of other jurisdictions as articulated above. Regardless of where born, a criminal defendant who is fluent in English and is aware of the proceedings against him has sufficient "presence" at, and opportunity to participate in, his trial to satisfy the requirements of Part I, Article 15 of the State Constitution. See State v. Cosme, 157 N.H. 40, 42 (2008); cf. State v. Decato, 165 N.H. 294, 297 (2013) (reciting two-prong standard for competency to stand trial: (1) sufficient present ability to consult with and assist counsel with a reasonable degree of rational understanding; and (2) a rational as well as factual understanding of the proceedings). Similarly, there can be no doubt that a defendant whose English language abilities are so impaired as to prevent comprehension of what is occurring cannot, in any realistic sense, be deemed to be "present" at the trial so as to confront his accusers, assist his counsel with his defense, or receive the fair trial that our State Constitution demands. Cosme, 157 N.H. at 42.

"The status of the right [to an interpreter] becomes less certain, however . . . [when] the defendant has some ability to understand and communicate, but clearly has difficulty." Carrion, 488 F.2d at 14. Many courts have stated that a trial court's determination as to whether an interpreter is needed when a defendant speaks some English, albeit imperfectly, will depend upon a variety of factors. See id.; United States v. Johnson, 248 F.3d 655, 661 (7th Cir. 2001); Nur v. State, 869 N.E.2d 472, 478 (Ind. Ct. App. 2007); Com. v. Garcia, 399 N.E.2d 460, 470 (Mass. 1980). These factors include: "the complexity of the issues and testimony presented during trial," Carrion, 488 F.2d at 14; "the language ability of the defendant's counsel," id.; and "the defendant's knowledge of English," Johnson, 248 F.3d at 661 (quotation omitted). Moreover, "considerations of judicial economy . . . dictate that the trial court, coming into direct contact with the defendant, be granted wide discretion in determining whether an interpreter is necessary." Carrion, 488 F.2d at 14; see United States v. Mayans, 17 F.3d 1174, 1179 (9th Cir. 1994) ("[The] fundamental question of whether an interpreter is necessary has been consigned to the wide discretion of the trial court." (quotation omitted)); Garcia, 399 N.E.2d at 470 (stating that the decision to appoint an interpreter is "uniquely within the province of the trial judge," who must be given "wide discretion"). Thus, federal and state appellate courts review a trial court's decision as to the need to appoint an interpreter using the abuse of discretion standard. See, e.g., Edouard, 485 F.3d at 1337; Nur, 869 N.E.2d at 480.

Although the defendant urges us to employ de novo review in light of the constitutional implications of the trial court's decision, we decline to do so. As

9

the court aptly observed in In re Ejoel M., 824 N.Y.S.2d 660, 662 (N.Y. App. Div. 2006),

> The determination whether a court-appointed interpreter is necessary lies within the sound discretion of the trial court, which is in the best position to make the fact-intensive inquiries necessary to determine whether there exists a language barrier such that the failure to appoint an interpreter will deprive the defendant of his or her constitutional rights.

(Quotation omitted). We agree that trial courts are in the best position to determine when a defendant has need for the services of an interpreter and that appellate courts are ill-equipped to second-guess such decisions. Accordingly, we conclude that the trial court's handling of the interpreter issue in this case is subject to review under our unsustainable exercise of discretion standard. Cf. State v. Lambert, 147 N.H. 295, 296 (2001) ("Because the 'abuse of discretion' standard may carry an inaccurate connotation, we will hereafter refer to it as the 'unsustainable exercise of discretion' standard."). "To show that the trial court's exercise of discretion was unsustainable, the defendant bears the burden of establishing that the decision was clearly unreasonable to the prejudice of his case." State v. Morrill, 154 N.H. 547, 550 (2006).

III

We first consider whether the trial court unsustainably exercised its discretion when it determined, at the pretrial hearing, that the trial could proceed without providing the defendant with an interpreter. During the pretrial hearing, the court properly engaged in a colloquy with the defendant to determine his English language abilities. See Johnson, 248 F.3d at 661 (stating that "the defendant's knowledge of English" is a factor for the trial court to consider when deciding whether an interpreter is needed). The colloquy covered a variety of topics, including: the defendant's immigration to the United States from Sudan; his schooling in Africa; the English language classes he took in New Hampshire; his understanding of the proceedings against him; and his past experience with the New Hampshire criminal justice system.

The trial court posed many questions to the defendant: some were phrased so as to require only "yes" or "no" answers, while others required more specific or detailed responses. In general, we are not convinced that the defendant's "yes" or "no" responses necessarily indicated a sufficient level of English proficiency. While they were responsive to the questions in a technical sense, they did not show the defendant's level of understanding with regard to each question. However, while these "yes" or "no" responses were common throughout the colloquy, there were also answers that were more detailed and

lengthy.  We find that these detailed responses – all of which were responsive to the questions posed – were indicative of the defendant's English language proficiency, in that they showed a deeper comprehension and command of English than was evidenced by his simple "yes" or "no" answers.

We agree with the Supreme Court of South Dakota that "there is perhaps no better indication for an appeals court that a defendant can speak and understand English than when the record reflects that he gave testimony or offered some other oral statement."  State v. Selalla, 744 N.W.2d 802, 810 (S.D. 2008).  In light of the hearing record, we are satisfied with the trial court's conclusion – based upon its face-to-face conversation and interaction with the defendant – that although "English isn't [the defendant's] first language, . . . he seemed to understand questions [the trial court] asked and [the trial court] seem[ed] to understand his responses to those questions."  We also are reassured by the fact that the defendant and defense counsel communicated with each other in English, and that counsel does not allege that he requested an interpreter to assist him in pretrial preparation sessions with the defendant.  See Mui v. United States, No. 99 CV 3627 (55)(RER), 2013 WL 6330661, at *19 (E.D.N.Y. Dec. 5, 2013) (finding that defendant's failure to request an interpreter to assist him in communicating with counsel pretrial "speaks volumes" about his ability to communicate in English).  According to the defendant, they were able to communicate successfully by going back and forth a lot, with defense counsel using examples to explain things to the defendant.  "Even though a defendant might not speak grammatically correct English, where the record satisfactorily demonstrates that such defendant [had] a sufficient command of the English language to understand questions posed and answers given, there has been no abuse of discretion in refusing to appoint an interpreter."  State v. Topete, 380 N.W.2d 635, 636 (Neb. 1986) (citation omitted).

In addition to examining the defendant's English language ability, the trial court also asked the State about the testimony and evidence it would introduce at trial.  See Carrion, 488 F.2d at 14 (stating that the "complexity of the issues and testimony presented at trial" are factors for the trial court to consider when deciding whether an interpreter is necessary).  The State indicated that it would call only two witnesses, and estimated that their testimony would take two hours at most. Based on this information, as well as the nature of the charge, we agree with the trial court's characterization of the case as "fairly simple."

Furthermore, prior to its ruling, the trial court proposed various accommodations to enhance the defendant's ability to understand the proceedings.  It asked the defendant whether he felt comfortable notifying defense counsel if he did not understand a witness, so that the trial court could give him time to consult with counsel.  The court also asked whether the

11

defendant felt comfortable letting it know when he was having a difficult time understanding what was happening. The defendant responded affirmatively to both questions. The trial court then assured defense counsel that he could take breaks whenever necessary, and suggested finding someone with whom the defendant could communicate when defense counsel was otherwise engaged. These accommodations undertaken by the trial court are similar to those employed in other cases where courts have upheld decisions not to appoint an interpreter for the defendant. See Carrion, 488 F.2d at 15 (no abuse of discretion by not appointing an interpreter where, among other factors, "the court told the appellant that if, at any point in the proceedings, there was something he did not understand, he need only raise his hand and the testimony would be repeated").

Overall, we are satisfied that the trial court's pretrial decision to proceed without an interpreter was a sustainable exercise of discretion and did not violate any of the defendant's rights under the State Constitution. As the Federal Constitution offers the defendant no greater protection than the State Constitution under these circumstances, as discussed above, we also find no violation of the Federal Constitution.

IV

The defendant next argues that, regardless of the correctness of its pretrial determination not to appoint an interpreter, the trial court unsustainably exercised its discretion by not reconsidering that decision and appointing an interpreter in light of what actually occurred during the trial. We disagree.

Initially, we agree with the defendant that the court's pretrial ruling did not end its responsibility with respect to this issue. Rather, similar to its responsibility to ensure that a defendant found mentally competent before trial remains so throughout the trial, see State v. Bertrand, 123 N.H. 719, 726 (1983),[7] the trial court was under a continuing obligation to assess whether the absence of an interpreter had the effect of denying the defendant a fair trial, see Commonwealth v. Pana, 364 A.2d 895, 898 (Pa. 1976). Therefore, "if it [became] apparent that an interpreter [was] necessary during the trial, the

---

[7] A defendant has a right not to be tried if he is mentally incompetent. See State v. Champagne, 127 N.H. 266, 270 (1985); see also Pate v. Robinson, 383 U.S. 375, 378 (1966) (stating that the conviction of an accused person while legally incompetent violates due process, and state procedures must be adequate to protect this right). "To protect this guarantee a defendant also enjoys the procedural advantage that if sufficient doubt exists of his competency to stand trial the trial court must sua sponte inquire into his competency." Bertrand, 123 N.H. at 725 (citation omitted). "A court's failure under such circumstances to inquire as to the defendant's competency deprives him of his constitutional right to a fair trial." Id. (quotation omitted).

12

court should [have], on its own motion or on a motion of a party, [made] an interpreter available." Id.

The defendant points to various events at trial that he argues triggered the trial court's obligation to appoint an interpreter: the trial court's preliminary jury instructions; the rate of speech of the trial court, the State's attorney, and witnesses at certain points; and the defendant's limited understanding of the testimony. We address each in turn.

In its preliminary instructions, the trial court advised the jury that it would take more frequent breaks to allow defense counsel time to confer with the defendant, whose primary language was not English. In making this statement, the court specifically told the jury that it should not "hold it against the Defendant or his attorneys that we're taking more breaks." That the trial court believed it necessary to give this instruction adds nothing to the defendant's argument, which we have already rejected, that the court's pretrial ruling to proceed without an interpreter was erroneous. The defendant does not claim that anything occurred between the time the court made its pretrial ruling and the time it gave this instruction that should have caused it to reconsider its decision, nor does the defendant suggest that the instruction itself was improper or prejudicial. The instruction simply informed the jury that English was not the defendant's first language and of the procedures the court would follow to accommodate this circumstance, and cautioned the jury that any delays resulting therefrom should not be held against the defendant.

The defendant next points to his complaint about the trial court's rate of speech during its preliminary instructions, arguing that his difficulty understanding them required the trial court to reconsider its decision not to appoint an interpreter. Although defense counsel's statement that the defendant did not understand what the trial court said as it was speaking was undoubtedly a matter of concern, counsel also acknowledged that the defendant did seem to comprehend the import of the instructions: that the jury's role was to listen and determine whether or not the defendant was guilty.

We are, moreover, reassured by the trial court's response to this concern. First, it pointed out that counsel had received a written copy of the instructions prior to the trial, and so had the opportunity to go over the instructions with the defendant before the trial began. Second, it offered to recess immediately so that defense counsel could explain the instructions to the defendant, an offer that counsel declined. And third, it reassured defense counsel that it would be mindful to speak more slowly throughout the remainder of the trial, showing an ongoing commitment to providing accommodations for the defendant. We are not persuaded that this incident required the trial court to revise its earlier ruling regarding the defendant's need for an interpreter. We find that the court's response to the defendant's concern was adequate, both

13

by ensuring that the defendant had the opportunity to understand what the court had said to the jury and by agreeing to moderate its rate of speech thereafter.

The defendant also argues that, given his limited English proficiency, the rate of speech used by the State's attorney and the State's witnesses impaired his understanding of the proceedings. The record does not support this claim. During the direct examination of the State's first witness, Officer Nathan Goard, defense counsel asked the prosecutor to slow her speaking pace. The prosecutor immediately agreed to do so. In addition, the court then addressed the witness – whose speaking pace had not been the subject of complaint – and instructed him to articulate and speak more slowly. The witness agreed, and there were no further objections or comments from the defense or the court concerning the speaking pace of either the prosecutor or Officer Goard during the remainder of the officer's examination.

Defense counsel objected once to the rate of speech of the second witness, motor vehicle hearings officer Brenda Hume, at the beginning of Hume's direct examination. Defense counsel also briefly mentioned the rate of speech during Hume's cross-examination, in which counsel implied – but did not directly assert – that she had spoken rapidly during her direct examination. At no point during Hume's testimony did counsel seek a recess or request any other relief. We note that defense counsel and the defendant had both agreed to notify the trial court if the defendant did not understand a witness. Thus, given the absence of an objection to the trial court's effort to address the concerns expressed by counsel during Officer Goard's testimony, as well as the single objection posed during Hume's testimony, we are not persuaded that these events should have caused the court to reassess the defendant's need for an interpreter.

To the contrary, the record reflects that during the course of the short trial, the trial court offered the defendant multiple opportunities for a recess so that his counsel could ensure that he understood the proceedings. Defense counsel took advantage of most of these offers, but never asked for additional recesses or stated that he needed more time to ensure that the defendant understood what was happening at trial – accommodations that the trial court had made clear it would "absolutely" allow. In this regard, the present case is similar to Selalla. In that case, the trial court offered to stop the proceedings at any time so that the defendant and counsel could confer. Selalla, 744 N.W.2d at 812-13. In affirming the trial court's decision to dismiss a second interpreter, the Supreme Court of South Dakota emphasized that "on not one occasion during the proceedings did either [the defendant] or defense counsel take the trial court up on its offer to suspend the proceedings so that they might counsel together." Id. at 813. Therefore, the court found "no basis upon

14

which to conclude that [the defendant] was in any way prejudiced" by the trial court's actions. Id.

The most significant factor demonstrating that the trial court did not err in failing to appoint an interpreter is the lengthy record of the defendant's own trial testimony. "There is perhaps no better indication for an appeals court that a defendant can speak and understand English than when the record reflects that he gave testimony . . . ." Id. at 810. "Even though a defendant might not speak grammatically correct English, where the record satisfactorily demonstrates that such defendant had a sufficient command of the English language to understand questions posed and answers given, there has been no abuse of discretion in refusing to appoint an interpreter." Topete, 380 N.W.2d at 636.

The defendant presented extensive testimony in his own defense. It is true that during his direct examination, when he was asked whether he understood the two witnesses who had testified for the State, he replied, "A little bit." And when counsel asked, "If someone talks fast in English, do you understand it well or no?", the defendant replied, "No." However, in considering the credibility of this testimony as it bore on the defendant's need for an interpreter, the trial court could properly consider the fact that the defendant's defense hinged upon his inability to understand English. Specifically, the defendant's defense at trial was that, due to his language deficiency, he did not understand that he had been certified as a habitual offender, and therefore did not knowingly violate the law. Thus, the court could have found that the defendant had a motive to embellish the extent of his inability to understand English.[8] In any event, based upon our review of the defendant's testimony, we are satisfied that he had a sufficient command of English to understand the proceedings, see Luna v. Black, 772 F.2d 448, 451 (8th Cir. 1985), assist in his defense, see Perez, 404 N.W.2d at 838, and convey his thoughts to the jury, see Faafiti, 513 P.2d at 699-700. The following colloquy relating to the circumstances surrounding the defendant's initial arrival in New Hampshire well demonstrates the point:

> DEFENSE COUNSEL: What happened when you stepped off the plane in Manchester?

---

[8] In denying the defendant's motion for a directed verdict, the court made the following statement: "I think that whether the jury accepts or doesn't accept Mr. Jur's testimony, and whether they think that he was exaggerating his English skills, or their lack thereof, and, you know, the credibility of what to believe . . . I think those are issue's [sic] that the jury needs to resolve." We agree with the trial court on this point and note that, although the evidence of the defendant's alleged inability to understand the proceedings that led to his certification as a habitual offender is relevant to his claim that the trial court erred in failing to appoint an interpreter, the only issue before us is the correctness of the interpreter appointment decision. The defendant does not challenge the sufficiency of the evidence to establish beyond a reasonable doubt that he knowingly violated the habitual offender statute, and thus we have no occasion to address that matter.

DEFENDANT:  Natalie, she come.

DEFENSE COUNSEL:  Natalie?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  Did you know who this person was?

DEFENDANT:  I don't know.

DEFENSE COUNSEL:  Okay.  So Natalie – a person came to meet with you?

DEFENDANT:  Yeah, she had my picture and my name, and too many people were in the airplane, and she came, she called, "Thomas, come." And then called me, we go in the car, then bring me to Manchester at Laurel Street, 213, Apartment 6, at 2003.  So they put me in the house. I have a bed to sleep, I have food.  That's it.

DEFENSE COUNSEL:  So for those first few months that you lived on Laurel Street, what did you do?

DEFENDANT:  Go to church, at (indiscernible) church.  I see some Africans there, and three weeks, I see one guy, his name is Don Lear (phonetic).  He worked in my father's church, and he said yeah, your dad's church is here, by the Pine Street.  I say oh, I don't know that.  I then we go in the church and we pray, you know.  So he talks to the friends he know to get me work.  I got and work at CCT, Bedford.

 "Aside from some syntactical errors, [the defendant's] testimony on the whole . . . appear[s] to be very responsive and indicative of [his] ability to speak and understand English."  Luna, 772 F.2d at 451. We do not doubt that the defendant would have been more comfortable, and better able to communicate, had he been able to speak in Dinka, his native language.   However, that is not the question before us.  See Vargas v. State, 627 S.W.2d 785, 787 (Tex. App. 1982) ("[T]he mere fact that [the defendant] might have been able to express himself a little better in Spanish did not require the use of an interpreter . . . .").  Instead, we must determine whether the defendant had a sufficient command of English to assist in his defense, understand the questions posed, and express himself to the jury.  In addition to various lengthy responses during direct examination, the defendant also admitted on cross-examination that he had never had a valid driver's license because he had never taken the test, and that it is "not okay" to drive without a license.

Overall, then, we are satisfied that the record shows that the defendant did have a sufficient command of English. Accordingly, we hold that the trial court did not unsustainably exercise its discretion in failing to appoint an interpreter during the trial. As the Federal Constitution offers the defendant no greater protection than the State Constitution under these circumstances, as discussed above, we reach the same result under the Federal Constitution as we do under the State Constitution.

V

Notwithstanding our analysis herein, we take this opportunity to remind trial courts of the obligations imposed upon them pursuant to our Language Services Plan, adopted after the trial in this case. Although the Plan does not eliminate the need for trial judges and other court personnel to make often difficult determinations concerning whether a person needs the services of an interpreter, it does ameliorate this burden to a significant degree by providing that "[w]hen it appears that an individual has any difficulty communicating, it is the [New Hampshire Judicial Branch's] policy to err on the side of providing an interpreter to ensure full access to the court." N.H.J.B. Language Services Plan, section V(B).

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY and BASSETT, JJ., concurred.