NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2014-0116


THE STATE OF NEW HAMPSHIRE

v.

PATRICK ESCHENBRENNER

Argued: April 9, 2015
Opinion Issued: October 27, 2015


Joseph A. Foster, attorney general (Stephen D. Fuller, senior assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.


BASSETT, J. The defendant, Patrick Eschenbrenner, appeals his convictions, following a jury trial, on five counts of pattern aggravated felonious sexual assault (AFSA), see RSA 632-A:2, III (2007); two counts of AFSA by individual acts, see RSA 632-A:2, I(l) (2007); and one count of witness tampering, see RSA 641:5 (2007). He argues that the Superior Court (Delker, J.) erred when, based upon his recent suicide attempts, it required him to wear a stun belt during his trial. He alleges that there was no manifest need for him to wear the stun belt, and, therefore, his rights to due process and counsel under the State and Federal Constitutions were violated. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, VI, XIV. We affirm.

The following facts are undisputed or are otherwise supported by the record. The defendant was charged with six counts of pattern AFSA, two counts of AFSA as individual acts, and one count of witness tampering. The defendant's trial was scheduled for April 2013, but it was delayed when, just before trial, he attempted to commit suicide. This was his second attempt at suicide while in custody. The defendant was moved to the secure psychiatric unit, and placed on a "suicide watch."

Because of the defendant's suicide attempts, the trial court held a hearing in June 2013 regarding security arrangements that might be needed during trial. Dr. Daniel Potenza, the psychiatric medical director for the New Hampshire Department of Corrections, testified that the defendant had been in the "most secure psychiatric facility in the state" for several weeks. According to Potenza, the defendant had "made it quite clear" that he was "looking for [a] clear opportunity to kill himself" and, "finding that opportunity, he [would] proceed to do that." Potenza stated that the defendant's condition had not improved with treatment, and that he could not predict when it might improve. When asked what measures the trial court could take to minimize the risk of harm to the defendant and the public during the trial, Potenza stated that "the safest place for [the defendant] to be is in his current surroundings at the secure psychiatric unit."

Several law enforcement officials also testified. The state prison warden described the defendant as "pretty adamant about hurting himself," and explained that it was "highly unusual to have somebody . . . that is currently on a suicide watch exit the prison." He emphasized that "the vulnerable time [for the defendant] is in the courtroom" because things that might seem "fairly innocuous to others," like paperclips and staples, may be dangerous and "have been used for serious attempts in the prison setting." The chief of security for the secure psychiatric unit and the residential treatment unit testified that a guard checked on the defendant "every 30 minutes," and that, because "[t]he doctor has not felt [it] safe enough to [allow the defendant] to have a regular tray . . . that can be broken and used for self[-]harm," the defendant was allowed only finger foods. Lieutenant Goff of the Rockingham County Sheriff's Office proposed specific security measures that could be used in the courtroom. She suggested that if the court wanted to "give the appearance that [the defendant was] not in custody," the defendant should wear a "stun belt" in the courtroom to "protect everybody in the courtroom by using the stun belt to stop [the defendant's] actions."

A stun belt is a form of prisoner restraint that is placed around the defendant's midsection, and is generally worn under the defendant's clothing so that it is not readily visible to the jury. United States v. Durham, 287 F.3d 1297, 1305 (11th Cir. 2002). It "is controlled by a remote device held by a security official in the courtroom." Id. at 1301. When activated, a stun belt delivers a high-voltage electric shock throughout the defendant's body that

2

"may cause incapacitation, severe pain, uncontrolled defecation or urination, muscular weakness, heartbeat irregularities or seizures." Hymon v. State, 111 P.3d 1092, 1098 (Nev. 2005). Although accidental activations are rare, they have occurred in some instances. See id.; Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1239 (9th Cir. 2001). But see People v. Mar, 52 P.3d 95, 112 (Cal. 2002) (noting "a disturbing number of accidental activations" of stun belts).

At the close of the hearing, the defendant requested a continuance in order to receive further treatment and to eliminate the need for restraints. The trial court granted the continuance, explaining that it did so, in part, to provide "time [for the court] to make a thoughtful and clear decision" about the proposed security measures due to the "significant constitutional issues connected to" them. The defendant subsequently filed a memorandum of law asserting that, due to the significant psychological and physical effects of wearing a stun belt, "a stun belt would violate [his] Sixth Amendment and Part I, Article 15 rights more than physical restraints." See N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI.

In November 2013, the trial court held a second hearing regarding security measures. Potenza testified that the defendant remained in the secure psychiatric unit on a suicide watch because Potenza had not seen enough improvement in the defendant's condition "to make a status change in terms of his precautionary watch." The defendant expressed concern about what the stun belt — if visible — would imply to the jury, and contended that the "deleterious psychological effect" of "wearing a weapon on his body" could affect his ability to communicate with counsel and infringe upon his rights to counsel and due process under the State and Federal Constitutions. The defendant also argued that, given that he had never exhibited unpredictable or disruptive behavior in the courtroom, the use of the stun belt was not justified. The defendant sought another continuance, arguing that his condition could improve with time and eliminate the need for such security measures.

The State countered that the fact that the defendant had not been disruptive in the courtroom was immaterial, and argued that the trial court should take whatever security measures were necessary to protect everyone in the courtroom, including the defendant himself. The State contended that, because the stun belt would not be visible to the jury, it was "the most minimally intrusive" restraint that the trial court could require.

The trial court denied the defendant's request for a continuance, concluding that, because the defendant's condition had not improved during the previous eight months, it was "not likely to improve significantly within a reasonable period of time." The trial court also ruled that: (1) the defendant would not have access to "any kind of sharp instruments, including pens, pencils, staples, paperclips, [and] binder clips"; and (2) "given [the defendant's] mental conditions . . . his risk of injuring himself . . . [and] the need to take

3

immediate action, if he does attempt something," a stun belt was "an appropriate measure." The trial court explained that the stun belt was "the most effective, least prejudicial way" to achieve courtroom security under the circumstances of the case.

Following a trial, the jury acquitted the defendant on one of the pattern AFSA charges, and convicted him on all of the remaining charges. This appeal followed.

The defendant argues that the trial court violated his rights to due process and counsel under the State and Federal Constitutions when, in the absence of manifest need, it required him to wear a stun belt during his trial. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, VI, XIV. He asserts that the trial court erred when it concluded that the threat that the defendant might commit suicide during trial justified the use of the stun belt. The State counters that, given the testimony at the two hearings that the defendant presented a danger to himself and others, the trial court acted within its discretion when it ordered the use of a stun belt. We first address the defendant's claims under the State Constitution, and rely upon federal law only to aid our analysis. See State v. Ball, 124 N.H. 226, 231-33 (1983).

"The power of the judiciary to control its own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court is a power absolutely necessary for a court to function effectively and do its job of administering justice." State v. LaFrance, 124 N.H. 171, 179-80 (1983). The trial judge "is ultimately responsible for ensuring the safe, reasonable and orderly progress of trial, and shackling or otherwise restraining a criminal defendant may occasionally be the only way to achieve this goal." Durham, 287 F.3d at 1303 (quotation omitted). Therefore, the trial judge is vested with the discretion to determine whether a need for restraints exists, and we review the trial court's decision to impose restraints on a defendant for an unsustainable exercise of discretion. State v. Gilbert, 121 N.H. 305, 309-11 (1981); cf. State v. Lambert, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). "To show that the trial court's exercise of discretion was unsustainable, the defendant bears the burden of establishing that the decision was clearly unreasonable to the prejudice of his case." State v. Jur, 166 N.H. 234, 244 (2014) (quotation omitted).

We first addressed the use of restraints in Gilbert, in which we concluded that a criminal defendant has a right "to appear in court free of any restraints," but "may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial." Gilbert, 121 N.H. at 309 (quotation omitted). Because we recognized that "the sight of the accused in handcuffs alone might interfere with the presumption of the defendant's innocence," id. at 310, we held that "a defendant should not be subjected to

4

physical restraints of any kind while in the jury's presence unless there is a showing of manifest need." Id. at 311.

We explained that the "trial court should conduct a formal hearing on the record prior to a view or a trial at which it is contemplated that a defendant is to be restrained," observing that "[r]estraints are to be avoided if possible, but if restraints are necessary, they should be as unobtrusive as is possible, although as effective as is necessary under the circumstances." Id. Thus, we concluded, the trial court must balance the interests of the State in protecting the courtroom from a defendant's violence against the interests of a defendant. Id. If the trial court "orders such restraint, the judge should enter into the record of the case the reasons therefor." Id. at 309 (quotation omitted). "When visible restraints are imposed, the court should, unless the defendant objects, sua sponte instruct the jury as to the presumption of the defendant's innocence and that such restraints should have no bearing on the determination of the defendant's innocence or guilt." Id. at 311.

We have not had occasion to address whether the "manifest need" analysis articulated in Gilbert should apply to the use of stun belts. Because the use of stun belts "raises all of the traditional concerns about the imposition of physical restraints," Gonzalez v. Pliler, 341 F.3d 897, 900 (9th Cir. 2003), we join those courts that have held that the "decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." Durham, 287 F.3d at 1306 (quotation omitted); see, e.g., United States v. Miller, 531 F.3d 340, 345 (6th Cir. 2008); Gonzalez, 341 F.3d at 901. Thus, we hold that the Gilbert manifest need standard applies to the use of a stun belt and we will review a trial court's decision to require the defendant to wear a stun belt under an unsustainable exercise of discretion standard. See Gilbert, 121 N.H. at 308-11.

Additionally, because "requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences" that may "pose a far more substantial risk of interfering with a defendant's . . . right to confer with counsel than do leg shackles," Gonzalez, 341 F.3d at 900 (quotations and brackets omitted), we emphasize that stun belts "should be used as rarely as possible." Miller, 531 F.3d at 345 (quotation omitted); see, e.g., Durham, 287 F.3d at 1306 ("Wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case."); Hymon, 111 P.3d at 1098 ("The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial — including those movements necessary for effective communication with counsel." (quotation omitted)). Accordingly, we hold that, just as the trial court has the continuing responsibility to ensure that a defendant found by the trial court to be mentally competent before trial remains so throughout the trial, see State v. Bertrand, 123 N.H. 719, 726

(1983), and just as it has the ongoing responsibility to continually reassess during trial whether a defendant requires an interpreter to meaningfully participate in the trial, see Jur, 166 N.H. at 247, so too does it have the ongoing responsibility during trial to assess whether the use of a stun belt has the effect of denying the defendant a fair trial.

Here, the defendant argues that the trial court erred when it found that the risk that the defendant would commit suicide gave rise to a manifest need for the use of the stun belt. He contends that the use of a stun belt "could only be validated by a legitimate basis to fear that [he] might attempt suicide in the courtroom," (emphasis added), and that there was no evidence that he had disrupted a court proceeding or had threatened to do so. Further, the defendant argues that, in light of the trial court's order that all writing implements and other sharp objects be kept away from the defendant, there was "no reasonable basis to fear" that he would harm himself in the courtroom. The State counters that, given the testimony at both hearings about the defendant's psychological state, and the amount of time that the trial court permitted for the defendant to receive treatment, "the record demonstrates that the question of [using] the stun belt received the necessary 'close judicial scrutiny,' and that lesser measures would not have sufficed." We agree with the State.

As an initial matter, we do not agree with the defendant that only a history of disruptive behavior in the courtroom could justify the use of a stun belt. "A trial judge should not be forced to wait until a defendant carries out his threats of violence before ordering the restraint of the defendant." State v. Woodard, 121 N.H. 970, 974 (1981). Thus, when deciding whether restraints are necessary, the trial court may properly consider the defendant's behavior both inside and outside the courtroom. See Mizell v. Warden, Madison Corr. Inst., No. 1:10-CV-53, 2011 WL 2636836, at *7 (S.D. Ohio Apr. 27, 2011) (requiring that, before ordering use of stun belt, the trial court consider "the [defendant's] actions both inside and outside the courtroom, as well as his demeanor while court is in session" (quotation omitted)).

Here, the trial court held two hearings over the course of five months regarding security measures for trial, and heard "substantial evidence upon which to base [its] conclusion that the circumstances were so extraordinary that they warranted the restraint of the defendant" using a stun belt. Gilbert, 121 N.H. at 310. Dr. Potenza testified regarding the specific "method and the circumstances" of the defendant's suicide attempts — the defendant first tried to hang himself, and later cut his jugular. As the trial court noted, one of the attempts "involved secreting a sharp instrument . . . into the prison."

Further, law enforcement officials testified about the serious security concerns raised by the defendant's past suicide attempts and his expressed desire to commit suicide. See Miller, 531 F.3d at 346 (explaining that opinions

6

of law enforcement officers may be "highly relevant to answering the ultimate inquiry as to whether [restraints are] necessary in a particular case"). These witnesses expressed concern about the defendant's threat to himself, and described the threat that the defendant's suicidal ideation posed to law enforcement officers and the public. The trial court also heard testimony from Potenza describing the defendant's fragile mental state and his desire to commit suicide. See Woodard, 121 N.H. at 974 (observing that psychiatric testimony supported conclusion that restraint was necessary). Potenza testified that the defendant had "made it quite clear" that if the defendant found any opportunity to kill himself, he would do so.

Additionally, the trial court had before it a memorandum from the defendant providing detailed information regarding the significant physiological effects of employing a stun belt. The trial court also considered the prejudicial effect of using visible restraints rather than a stun belt. See Gilbert, 121 N.H. at 311 (emphasizing that restraints should be "as unobtrusive as is possible, although as effective as is necessary under the circumstances"). When explaining his reasoning for deciding to use a stun belt, the trial judge noted that, in "at least three or perhaps four trials" in which a defendant had worn a stun belt, he "could not tell that the [defendant] had anything unusual on [him]." The trial court explained that, because, in those cases, the stun belt was worn "under ordinary civilian clothing," there was nothing to indicate to an observer that any restraints were being used. The court concluded that a stun belt was the "least prejudicial" way to restrain the defendant.

We are satisfied that the trial court gave "close judicial scrutiny" to this issue. Durham, 287 F.3d at 1306 (quotation omitted); see Gilbert, 121 N.H. at 311 (requiring trial court to provide reasons for ordering restraints on the record). We conclude that the trial court sustainably exercised its discretion when it found that there was a manifest need for the defendant to be restrained using a stun belt during his trial. The State Constitution provides at least as much protection as the Federal Constitution under these circumstances. See State v. Currier, 148 N.H. 203, 207 (2002) (recognizing that Part I, Article 15 is "at least as protective of the defendant's rights" as the Due Process Clause of the Fourteenth Amendment and the Fifth Amendment of the Federal Constitution); State v. Marti, 143 N.H. 608, 611 (1999) (same for Sixth Amendment). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

7